**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DECOMA LOVE-LANE,
　　　　　　　　*Plaintiff-Appellant,*

v.

DONALD MARTIN, Individually, and
in his official capacity as
Superintendent of the Winston-
Salem/Forsyth County Schools;
WINSTON-SALEM/FORSYTH COUNTY
BOARD OF EDUCATION,
　　　　　　　　*Defendants-Appellees.*

No. 02-1465

Appeal from the United States District Court
for the District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-99-735)

Argued: January 24, 2003

Decided: January 22, 2004

Before WILKINSON, MICHAEL, and GREGORY, Circuit Judges.

───────────────

Vacated in part, affirmed in part, and remanded by published opinion.
Judge Michael wrote the opinion, in which Judge Gregory joined.
Judge Wilkinson wrote a separate dissenting opinion.

───────────────

## COUNSEL

**ARGUED:** Robert Mauldin Elliot, Fredrick Wellington Evans,
ELLIOT, PISHKO & MORGAN, PA, Winston-Salem, North Caro-

lina, for Appellant. Max Daniel McGinn, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellees. **ON BRIEF:** Natalie Kay Sanders, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellees.

## OPINION

MICHAEL, Circuit Judge:

Decoma Love-Lane, an African American, sued the Winston-Salem/Forsyth County, North Carolina, Board of Education (the Board) and its superintendent, Dr. Donald Martin, in the Middle District of North Carolina, alleging that she was demoted from the position of assistant principal to teacher because she spoke out against race discrimination (her free speech claims) and because of her race (her discrimination claims). The district court granted summary judgment to the Board and Martin on all of Love-Lane's claims, and she appeals. We conclude that Love-Lane has raised a genuine issue of material fact as to whether she was demoted in retaliation for her speech, which would be a violation of the First Amendment. We also conclude that Martin is not entitled, in his individual capacity, to qualified immunity on Love-Lane's First Amendment claim, and we therefore vacate the grant of summary judgment to Martin individually on that claim. We affirm the grant of summary judgment (1) to the Board, and to Martin in his official capacity, on Love-Lane's First Amendment claim, (2) to both defendants on her federal race discrimination claims, and (3) to both defendants on her free speech and race discrimination claims asserted under the North Carolina Constitution.

I.

Love-Lane is employed by the Winston-Salem/Forsyth County Board of Education. She worked for the Board as a high school teacher from 1974 until 1988, and from 1988 until 1998 she was an assistant principal at four middle and elementary schools. In her first three jobs as assistant principal, which spanned seven years (1988-95), Love-Lane consistently received evaluations of excellent or supe-

rior in almost all aspects of her performance; she was told that her strongest skills were in the areas of communication and problem solving. J.A. 2000. Each of the principals for whom she worked in these years recommended her for promotion. J.A. 1199-2000.

During the summer of 1995, Superintendent Martin notified Love-Lane that she would be assigned the job of assistant principal at Lewisville Elementary School, where Martin said "an African-American presence" was needed. J.A. 1444. Love-Lane expressed concern to Martin about the assignment because she had heard that Lewisville's principal, Brenda Blanchfield, who is white, had difficulty in dealing with African American assistants. Love-Lane also understood that there were racial tensions at Lewisville because Blanchfield had been ineffective or insensitive in addressing the problems and concerns of African American teachers, students, and parents. J.A. 362, 366-67, 594, 1164, 1201, 1215. Love-Lane's understanding was accurate. According to one African American teacher, "serious racial tension" developed between the school administration and staff at Lewisville after Blanchfield "took over as principal." J.A. 362. For instance, on one occasion the Lewisville faculty was discussing time options for a satellite PTA meeting in East Winston, a predominantly African American community served by the school. When a late afternoon meeting was proposed, several teachers pointed out that working parents would not be able to attend. Blanchfield responded that "it did not matter what time the meeting was held since nobody in East Winston works anyway." J.A. 1165, 363. After certain teachers objected to this comment, Blanchfield apologized. *Id.* On another occasion, Blanchfield allegedly used the term "CP time, or colored people's time." J.A. 1402. Martin acknowledged that "there were some problematic situations [at Lewisville] in terms of racial perceptions," J.A. 76, and that "minority parents perceive Lewisville and Brenda Blanchfield negatively," J.A. 77. Daisy Chambers, an assistant superintendent who knew both Blanchfield and Love-Lane, recommended that Love-Lane not be assigned to Lewisville. Because Blanchfield and Love-Lane had different approaches to administration, Chambers believed that they would have difficulty "work[ing] together as a team." J.A. 607. Despite the concerns expressed by Chambers and Love-Lane, Martin held to his decision, and Love-Lane was transferred to Lewisville. Love-Lane accepted the new assignment, telling Martin that she would do her best to work with

Blanchfield. Love-Lane, however, asked Martin to "monitor the situation," and he promised that he would. J.A. 1201.

Love-Lane started her job as assistant principal at Lewisville Elementary School in November 1995. The school is located in the suburbs and to a large extent serves middle to upper class white children from the surrounding area. However, a number of African American children from poor or working class families in East Winston are bused to Lewisville. During Love-Lane's three years at the school, about sixty-five percent of the students were white and about thirty-five percent were African American. Love-Lane describes the Lewisville staff as "overwhelmingly white." Out of a staff of approximately 100, the number of African American teachers ranged from two to six during Love-Lane's time at the school. J.A. 1201.

Soon after Love-Lane began working at Lewisville, she discovered disciplinary practices at the school that placed many African American students at a disadvantage. Her main concern was the "time-out room," where teachers could send students who were misbehaving. Love-Lane had several objections to the time-out room. First, a disproportionate number of African American students, particularly African American boys, were sent to the time-out room. Some teachers called on white girls to escort African American boys to the room, a practice that was no doubt humiliating to the boys. J.A. 1207. Second, the time-out room served to relieve individual teachers of responsibility for handling discipline problems in the classroom. A student could be referred to the room for any infraction without the knowledge or approval of the principal or assistant principal. In other words, there were no safeguards to prevent a teacher from making excessive use of the time-out room. Love-Lane noticed that students were often sent to the room "for the most minor of infractions." J.A. 1205. At times there were so many children crowded into the room that there was "standing room only." J.A. 1220. Third, the students who were sent to the time-out room were not given adequate instruction. The staff person who ran the time-out room was not a certified teacher, and she had no training in how to deal with problem students. The problem of inadequate instruction was magnified because "many of the same students [were] referred to the time-out room repeatedly, for long periods of time by many of the same teachers." J.A. 1207. According to Love-Lane, the time-out room "denied quality instruction to many

of the children who needed it most — the African-American children who were being bused from East Winston." J.A. 1207. Love-Lane was especially concerned about fifth grade students because several of their teachers were strong advocates of the time-out room and used it continually. J.A. 1204, 1405. Some fifth graders were sent routinely to the time-out room at 8:45 a.m., just as classes began for the day. J.A. 1220. Love-Lane feared that the room was used, especially by some fifth grade teachers, simply to "warehouse" African American boys. J.A. 1203, 1204-07, 1212-14.

Love-Lane's assessment that the time-out room was being used in a racially discriminatory way is indicative of larger concerns that she and others had about race relations at Lewisville. Love-Lane observed that disciplinary measures in the classrooms "seemed directed toward the black students for the most part," both in terms of frequency and severity of punishment. J.A. 1214. Another Lewisville staff member recounted how one teacher "would have black males sit at desks facing the corner of [the] room with their faces to the wall." J.A. 1227. What Love-Lane saw as discriminatory discipline extended beyond the classroom. Once, Love-Lane saw a teaching assistant "with her foot in a little black boy's back as he lay on the hall floor crying." J.A. 1207. On another occasion, Love-Lane had a substantial disagreement with several fifth grade teachers who were excluding a number of African American and poorer white students from the class trip to Washington, D.C., and Williamsburg, Virginia. There were no established criteria for excluding a student, and the teachers were using minor infractions to justify exclusion. Love-Lane brought the problem to the attention of Blanchfield, who refused to intervene. As a result, "approximately full classes of students were left at the school, most of whom were African-American and poor students." J.A. 1214.

Love-Lane also believed that a number of staff members at Lewisville were insensitive to African American culture. J.A. 1202. One day, for example, an African American girl went home in tears after her fifth-grade teacher barred her from class "because, in [the teacher's] terms, the student's 'jelly curl or what ya'll call it, stinks.'" J.A. 1213. *See also* J.A. 1226. The director of the Board's African-American Infusion Project observed that many teachers at Lewisville were not receptive to diversity training workshops, and the director

was especially "concerned that Mrs. Blanchfield did not seem to address the problem of the teachers' insensitivity or lack of interest" in this area. J.A. 360. Parents of African American children expressed similar concerns about "the racial problems at Lewisville," J.A. 389, and about "teachers who seemed to have no awareness or sensitivity to racial issues." J.A. 393.

Despite her concerns about the time-out room and other disciplinary practices that appeared to be discriminatory, Love-Lane "was careful not to make any quick judgments" during her first year at Lewisville (1995-96). J.A. 1203. Instead of "question[ing] how things were done," she concentrated on "getting acquainted with the staff, teachers and students," J.A. 1203, and in trying to establish good relationships with her colleagues, J.A. 127. By the end of her first year, she felt accepted by her Lewisville colleagues, and she received a superior evaluation from Blanchfield, the principal.

As her second year (1996-97) at Lewisville got under way, Love-Lane felt that she had to discuss with Blanchfield her concerns about the discriminatory disciplinary practices at Lewisville. Love-Lane understood her professional charge from Martin to be "raising the awareness or consciousness of [Lewisville] teachers" about minority issues, and she understood that she and Blanchfield were to work together on this goal. J.A. 127. But every time that Love-Lane tried to discuss her concerns about disciplinary practices, including use of the time-out room, with Blanchfield, she was either rebuffed or ignored. J.A. 1206, 1208. After Blanchfield refused to address the subject of discriminatory discipline, Love-Lane began voicing her concerns at faculty meetings and at School Improvement Team (SIT) meetings. J.A. 363-64, 388. The SIT was an advisory group of administrators, teachers, and parents, whose goal was to "make suggestions designed to improve education at Lewisville for all students." J.A. 387. Love-Lane and Blanchfield both attended SIT meetings. *Id.* One parent-member of the SIT said that in these meetings Love-Lane often raised issues about disciplinary practices that placed African American and poorer students at a disadvantage. According to this parent, "it would be evident from Ms. Blanchfield's body language that she resented Ms. Love-Lane bringing up these issues . . . [though] Ms. Love-Lane always acted respectfully toward Ms. Blanchfield." J.A. 388. Some of the teachers, especially from the fifth grade, also

resented the fact that Love-Lane was raising questions about disciplinary practices at Lewisville. J.A. 364, 415. After Love-Lane spoke out at one faculty meeting, a few teachers told Blanchfield that they were offended by Love-Lane's disrespectful tone and by her characterization of the teachers' use of the time-out room as "unprofessional." J.A. 955. Love-Lane denies that she was disrespectful, and a number of teachers and parents who heard Love-Lane talk about the disciplinary practices described her tone and manner as professional and respectful. J.A. 354, 387-88, 394. Nevertheless, as one teacher's assistant put it, "[i]t was common knowledge throughout the school that some of the fifth grade teachers had banded together against Ms. Love-Lane." J.A. 398.

During her second year at Lewisville, Love-Lane also expressed her concerns about race discrimination in discipline directly to Superintendent Martin. J.A. 1208, 1210-11. She told him that "African-American parents were not happy with how their children were being treated at Lewisville." J.A. 1407. According to Love-Lane, "Martin indicated little concern for the racial issues I was raising; he seemed more concerned that I not make waves—that I avoid any actions which might cause conflict." J.A. 1210. Martin said that he discounted Love-Lane's concerns that minority children at Lewisville were being "denied equal access to education" because he did not agree with her assessment of the situation. J.A. 1365.

At the end of Love-Lane's second year at Lewisville, she received her annual evaluation from Blanchfield. Although she received excellent ratings on most of her work, she received for the first time lower ratings on her communication skills. Blanchfield told Love-Lane that 85 percent of the teachers found her intimidating and that they objected to her direct style of communication. J.A. 1210. Blanchfield refused, however, to provide Love-Lane with any details about these complaints. *Id.* Blanchfield did tell Love-Lane that she had concerns about Love-Lane's inability to accept feedback and her "blatant actions of disrespect toward" Blanchfield. J.A. 868-69. Blanchfield recommended that Love-Lane receive only a two-year contract as an assistant principal. J.A. 869. (Administrators were given contracts of up to four years.) Blanchfield informed Love-Lane that she had "many strengths which if coupled with improvements in working relationships and respect for those [Love-Lane is] assigned to work with

would make [her] very effective and efficient in a leadership role." *Id.* Blanchfield then advised Martin that she no longer wanted to work with Love-Lane. Love-Lane, for her part, requested a transfer. J.A. 969, 1211. At the end of this second year Love-Lane again confronted Martin about "the treatment of African-American children [at Lewisville], particularly with reference to the time-out room." J.A. 1211. According to Love-Lane, "Martin listened but made no commitment to take any action." *Id.* Love-Lane received no response to her transfer request. *Id.*

On June 11, 1997, as her second year at Lewisville was ending, Love-Lane was involved in an altercation with a teacher. Each woman alleged that the other called her names and used profanity. Blanchfield issued a letter of reprimand to both women, prompting Love-Lane to file a grievance. J.A. 1069. Love-Lane filed her employee grievance form on August 15, 1997, claiming that she was being discriminated against because of her race. J.A. 1017. She alleged that the letter of reprimand was based on Blanchfield's biased investigation. *Id.* Love-Lane's grievance prompted Superintendent Martin to assign a paralegal in his office to conduct an investigation into the altercation. J.A. 1029. The investigator reviewed the materials that had been compiled by Blanchfield in her investigation of the altercation, and he interviewed witnesses identified by both Blanchfield and Love-Lane. The investigator concluded that both Love-Lane and the teacher had used profanity and that Blanchfield's reprimands were justified. J.A. 1029-31. Martin received a written and oral report from the investigator in early September 1997. *Id.* Based on the report, Martin sent Love-Lane a letter on September 23, 1997, warning her that "[a]nother such outburst" would result in a recommendation for her dismissal. J.A. 975. Martin did not personally investigate Love-Lane's discrimination claim because, according to him, "race had nothing to do with [the problems between Love-Lane and Blanchfield]. It was clearly personality conflict. Race had nothing to do with it." J.A. 1401.

In October 1997, at the beginning of Love-Lane's third year at Lewisville, Martin met with her and Blanchfield. In a letter that Martin handed to both women, he strongly encouraged them to work together in a spirit of cooperation; otherwise, he said, changes would have to be made at Lewisville. J.A. 969. Martin made several points

in his letter. He noted that "neither [Blanchfield nor Love-Lane] has much respect or trust in the other" and that he had never "experienced a conflict between two school administrators as acrimonious and divisive." J.A. 976. Martin said, however, that "there is no . . . basis to believe that the conflict between these two administrators is based upon the race of the individuals." J.A. 978. Martin did believe that the bad working relationship between the two women "adversely affected the effectiveness of the administration of the school," J.A. 977, but he was careful to note that the welfare and safety of the students were not at risk, J.A. 978. Martin's letter had specific warnings for Love-Lane. She was told that if she disagreed with any of Blanchfield's policies, she should state her disagreements to Blanchfield in private, not in public to the faculty, students, or parents. J.A. 979. Finally, Love-Lane was warned that she would have no future as a school administrator unless she was "able and willing to respect the authority of the principal and to rebuild that degree of trust that is necessary for her to function effectively as a school administrator." J.A. 980. Love-Lane responded to Martin's letter by telling him once again that "it was the students [she] was concerned about," especially the African American students who "were being treated improperly in the time-out room and otherwise." J.A. 1212. Martin, who admits that Love-Lane raised these concerns a number of times between the spring and fall of 1997, J.A. 968, 1306, told Love-Lane that it was not her "job to worry about the children . . . but that it was [her] job to please [her] principal," J.A. 1212. Martin ignored Love-Lane's expressions of concern about the discriminatory disciplinary practices and told her point blank that he did not want to "hear from [her] or Lewisville that year." *Id. See also* J.A. 1306.

Notwithstanding Martin's warnings, Love-Lane continued to voice her concerns about race discrimination at Lewisville during her third year (1997-98) there. As a result, her relationship with Blanchfield deteriorated even further. In January 1998 the fifth grade teachers complained about Love-Lane to Blanchfield and requested that another administrator be assigned to the fifth grade team for the rest of the year. J.A. 959-61. Specifically, the teachers told Blanchfield that they were having difficulty in communicating with Love-Lane and that she was not treating them as professionals. *Id.* In the spring of 1998 the fifth grade teachers again complained, this time to Martin, about their difficulties in working with Love-Lane. J.A. 1155-56.

According to Martin, these teachers regarded Love-Lane as overbearing, intimidating, and unsupportive of their disciplinary practices. J.A. 1328, 1372. On May 7, 1998, Blanchfield completed a draft evaluation of Love-Lane's performance for her third year at Lewisville. Blanchfield rated Love-Lane "below standard" and "unsatisfactory" in three areas that related primarily to communication skills and efforts. Love-Lane received ratings of "at standard" or above in eight of eleven evaluation categories, including two ratings of "well above standard." J.A. 292-96. Martin and Amanda Bell (an assistant superintendent) reviewed the evaluation before it was given to Love-Lane. J.A. 290. On May 11, 1998, Blanchfield sent Love-Lane a memo, with copies to Martin and Bell, stating that she (Blanchfield) considered Love-Lane's "continued vocal opposition to our implementation of the Time-Out Room as blatant disrespect for me." J.A. 1268. On June 2 Martin sent Love-Lane a memo informing her that she would "be assigned to a different school, working in a non-administrative position for the 1998-99 school year." J.A. 481. Love-Lane was ultimately assigned to teach high school classes at North Forsyth High School. J.A. 1216. Love-Lane's pay level was maintained until the end of her administrative contract. Martin's memo informed Love-Lane of Blanchfield's claim "that [Love-Lane] put forth minimal efforts to carry out the role, responsibilities, and functions of an assistant principal," which resulted in her lower evaluation for the 1997-98 school year. J.A. 481. Martin claimed that Love-Lane had failed to respond positively to his October 1997 recommendations and that she lacked the "ability or desire to rebuild respect and trust" with Blanchfield and other staff members at Lewisville. *Id.* Martin concluded that Love-Lane's "unwillingness to re-establish working relationships with the principal and staff" had convinced him that Love-Lane did "not have a future as an administrator" in the school system. *Id.* Martin says that he "was not aware of, and did not consider" that Love-Lane "had engaged in any First Amendment activities." J.A. 973. Blanchfield, too, was transferred out of Lewisville and was placed at the school system's central office for the 1998-99 year. J.A. 290.

   Love-Lane filed a grievance with the Board challenging Martin's decision to reassign her. A panel of three Board members held a hearing in Love-Lane's case on August 4, 1998, and the following two issues were considered:

> 1.   Whether or not the recommendation of the Superin-
> tendent [Martin] to non-renew the two-year administrative
> contract of Ms. Decoma Love-Lane is arbitrary, capricious,
> or for personal or political reasons.
>
> 2.   Whether or not the Superintendent [Martin] has the
> authority to assign Ms. Love-Lane to a teaching position for
> the remaining year of her administrator's contract.

J.A. 991. The three-member Board panel received documents from
both sides, including a "grievance book" that Love-Lane had com-
piled. J.A. 273, 304. The panel also heard statements from Love-
Lane's lawyers, Love-Lane, Martin, and Blanchfield. *Id.* The minutes
of the hearing reflect that one of Love-Lane's lawyers argued to the
panel that "the disagreements evidenced in the record between Ms.
Blanchfield and Ms. Decoma Love-Lane were personal in nature and,
therefore, the Board should not uphold" Martin's decision. J.A. 992.
Love-Lane told the panel that "her career was being sabotaged by Ms.
Blanchfield" and that Blanchfield's recommendations regarding
Love-Lane's future were "personal in nature." J.A. 993. Love-Lane
denied that her performance had been unsatisfactory or below stan-
dard. *Id.* Martin said that the reasons stated in his June 2, 1998, memo
to Love-Lane justified his decision to remove her from the assistant
principal's job at Lewisville and reassign her to a teaching position.
The Board panel voted 2-1 to uphold Martin's reassignment decision.
The one member who dissented did so because it appeared that "Dr.
Martin had already made up his mind about what he wanted to hap-
pen." J.A. 264. This member "became concerned because [she] didn't
feel that [Martin] had given Ms. Love-Lane a fair shake." *Id.* Because
the panel's decision was not unanimous, Love-Lane was able to
appeal the issue to the full Board, which upheld the decision after
reviewing the record before the panel and hearing argument from the
lawyers for both sides. J.A. 273-74, 314-15. Love-Lane continues to
work in her high school teaching position, but she claims to have lost
any opportunity to pursue her preferred career path in school adminis-
tration. J.A. 1216.

On August 28, 1998, Love-Lane filed a charge of race discrimina-
tion and retaliation against the Board and Martin with the Equal
Employment Opportunity Commission (EEOC). She received a right

to sue letter from the EEOC on June 30, 1999. On August 26, 1999, Love-Lane filed a complaint in federal court against the Board and Martin, alleging race discrimination, retaliation, and the denial of her rights to free speech and due process of law in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the North Carolina Constitution. After extensive discovery the defendants filed a motion for summary judgment, which the district court granted. The district court concluded that Love-Lane could not establish a violation of her rights to free speech and due process of law and that she failed to make out a prima facie case of race discrimination. J.A. 644-84. Love-Lane appeals the judgment, but she does not pursue the due process claim.

## II.

Love-Lane contends that the district court erred in granting summary judgment to the Board and Martin on her free speech and race discrimination claims. We review the summary judgment decision de novo. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the summary judgment, we view the facts in the light most favorable to Love-Lane, the non-moving party, drawing all justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The dissent does the opposite: it ignores the best of Love-Lane's evidence and states the facts in the light most favorable to the Board and Martin. This mistaken approach, of course, allows the dissent to say that this case involves nothing more than a superintendent's "decision to separate . . . two administrators embroiled in a personality conflict." *Post* at 33-34. This case involves much more than a personality conflict when the facts are viewed, as they must be, in Love-Lane's favor: it involves a superintendent who demoted an assistant principal because she spoke out against race discrimination in discipline at a public school.

III.

A.

We turn first to the district court's rejection of Love-Lane's claim, asserted under 42 U.S.C. § 1983, that the Board and Martin violated her right to free speech guaranteed by the First Amendment to the Constitution of the United States. The government may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968). This means, for example, that "[a] state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 155-56 (4th Cir. 1992). The First Amendment does not protect all speech by public employees. "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" fall outside the First Amendment because they are not matters of public concern. *Id.* at 156. Even speech on a matter of public concern does not automatically qualify for First Amendment protection: the speaker's interest in free expression is "tempered by the government's interest in governmental effectiveness, efficiency, order, and the avoidance of disruption." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998).

Retaliatory employment action violates a public employee's right to free speech under the following conditions. First, the speech must relate to a matter of public concern. *Id.* Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000) (internal quotation marks omitted) (citing *Pickering*, 391 U.S. at 568). (This part of the inquiry is known as the *Pickering* balancing test.) Third, there must be a causal relationship between the protected speech and the retaliatory employment action; specifically, "the protected speech [must be] a 'substantial factor' in the decision to take the allegedly retaliatory action." *Id.* (internal quotation marks and citation omitted). The first two elements involve questions of law. The third element, causation, can be decided on "summary judgment only in those instances when there are no causal facts in dispute." *Id.*

1.

The first question is whether Love-Lane's speech was about a matter of public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000). The Supreme Court has made it clear that statements about a "[s]chool [d]istrict's allegedly racially discriminatory policies involve[ ] a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983) (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)). We, too, have repeatedly recognized that a public employee's speech about racially discriminatory practices, particularly in public schools, involves a matter of public concern. *See Seemuller v. Fairfax County Sch. Bd.*, 878 F.2d 1578, 1582 (4th Cir. 1989); *Arvinger v. Mayor & City Council of Baltimore*, 862 F.2d 75, 78 (4th Cir. 1988); *cf. Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1079 (4th Cir. 1987); *English v. Powell*, 592 F.2d 727, 732 n.5 (4th Cir. 1979). In analyzing whether speech involves a matter of public concern, we consider "the content, form, and context of [the] given statement[s], as revealed by the whole record." *Connick*, 461 U.S. at 147-48. In this case, content and context are key. The content or subject matter of Love-Lane's speech dealt with disciplinary practices at Lewisville that discriminated against African American children. According to Love-Lane, African American children were disciplined more severely than other students. For example, they were sent more often to the time-out room, where they received no meaningful instruction. This speech did not relate to a private issue between Love-Lane and her employer. Rather, the summary judgment record demonstrates that it dealt with an issue of major concern to many in the Lewisville school community, including teachers, parents, and students.

The context of Love-Lane's speech is also important. Race discrimination in discipline was a topic Love-Lane spoke up about at SIT meetings, at Lewisville faculty meetings, and at private meetings with Blanchfield or Martin. The meetings of the SIT (the advisory group of teachers, administrators, and parents) often focused on how to improve the education of Lewisville's "at-risk kids," many of whom were African American. J.A. 387-88. Thus, at SIT meetings when Love-Lane talked about race discrimination in discipline, she

was raising exactly the sort of issue that was meant to be discussed at such meetings — meetings that were attended by parent representatives from the community. *Cf. Piver*, 835 F.2d at 1081 (noting that the public importance of a teacher's speech on the subject of a principal's tenure was demonstrated when "part of the speech took place at a public meeting called for the very purpose of soliciting opinions" on the tenure question). The fact that Love-Lane at times voiced her complaints about discriminatory discipline in faculty meetings and in private meetings with Blanchfield or Martin does not forestall a conclusion that her speech involved a matter of public concern. In the end, Love-Lane's "right to protest racial discrimination—*a matter inherently of public concern*—is not forfeited [because she sometimes chose] a private forum." *Connick*, 461 U.S. at 148 n.8 (emphasis added). *See also Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996). In sum, the content and context of Love-Lane's speech establish that she was speaking about a matter of public concern.

The dissent claims that "Love-Lane's speech on . . . discriminatory practices was but a small part of her tenure at Lewisville." *Post* at 41. It thus suggests that Love-Lane did not speak out often enough about discriminatory discipline to qualify as a citizen speaking on a matter of public concern. *See post* at 40. This simply ignores *Love-Lane's* evidence in the summary judgment record. Time and again, that evidence shows, Love-Lane voiced her opposition to the time-out room and other disciplinary practices that discriminated against African American students. J.A. 385, 387-88, 415, 1168. She pointed out that African American students were disciplined in ways that often excluded them from regular class participation and from participation in activities such as class trips. J.A. 1203-07. Love-Lane has proffered evidence that she was persistent in speaking up about these problems, particularly the time-out room, in discussions with Blanchfield and Superintendent Martin and in meetings of the faculty and the SIT. One parent-member of the SIT summed up the focus and persistence of Love-Lane's speech in this way:

> Ms. Love-Lane informed us [in the SIT meetings] that there was an overwhelming number of African-American students that were in the time-out room, that were sent to the office, and that were suspended. Ms. Love-Lane attempted to address the reasons for this situation *time and again*. Ms.

> Love-Lane spoke out about the fact that some of the teach-
> ers were arbitrary in their discipline, and did not know how
> to control African-American children. She expressed con-
> cerns about some teachers' lack of understanding of cultural
> differences. She wanted us to try to work towards resolving
> the problem.

J.A. 394 (emphasis added). The record, when read in the light most
favorable to Love-Lane, leaves no doubt that she spoke out regularly
about discriminatory discipline, a matter of public concern.

2.

Next, we consider whether Love-Lane's free speech interest out-
weighs the interest of the Board and the Superintendent in the effi-
cient operation of the school system. *See Pickering*, 391 U.S. at 568.
The interest of the community is also weighed in this evaluation. *Cro-
mer*, 88 F.3d at 1326. The government employer must make a
stronger showing of the potential for inefficiency or disruption when
the employee's speech involves a "more substantial[ ]" matter of pub-
lic concern. *Connick*, 461 U.S. at 152. *See also Hall v. Marion Sch.
Dist. No. 2*, 31 F.3d 183, 195 (4th Cir. 1994) ("When an employee's
speech substantially involves matters of public concern . . . the state
must make a stronger showing of disruption in order to prevail."). An
assistant principal's detailed claim of race discrimination against Afri-
can American students in a public school involves a serious and sub-
stantial issue of public concern. The summary judgment record
demonstrates that this issue was of special importance to parents of
African American children at Lewisville and to many in the larger
community. J.A. 75-76, 387-88.

Because of the especially strong interest of the speaker (Love-
Lane) and the community in the subject of Love-Lane's speech, the
Board and Martin bear a heavier burden in attempting to show that
their efficiency concerns outweigh Love-Lane's free speech interests.
Factors that we take into account in balancing these interests include
whether the employee's speech (1) impairs the ability of supervisors
to mete out discipline, (2) impairs harmony among co-workers, (3)
damages close working relationships, (4) impedes the performance of
the public employee's duties, (5) interferes with the operation of the

agency, (6) conflicts with the responsibilities of the employee within the agency, and (7) is communicated to the public or to co-workers in private. *McVey*, 157 F.3d at 278 (citing *Rankin v. McPherson*, 483 U.S. 378, 388-91 (1987)). In this case the Board and Martin argue that Love-Lane's speech adversely affected school administration and resulted in poor working relationships between Love-Lane and other teachers and between Love-Lane and Blanchfield.

In considering the employer's efficiency concerns, we take into account the disruptions or inefficiencies caused by the content of the speech for which First Amendment protection is sought. *Givhan*, 439 U.S. at 415 n.4. Of course, the speech "will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388. The defendants' proffered evidence reveals that certain teachers (mostly from the fifth grade) and administrators regarded Love-Lane as abrasive and confrontational. J.A. 1002-03, 1155-56, 1210. A few fifth-grade teachers complained on one occasion that Love-Lane called their use of the time-out room "unprofessional." And Blanchfield said that she took Love-Lane's vocal opposition to the time-out room as a sign of "blatant disrespect." It appears that the teachers and administrators who took offense at Love-Lane's manner or tone also took offense at the content of her speech opposing race discrimination in discipline. (The dissent contends that this last statement "finds no support in the record," *post* at 41, but it does. For example, one fifth-grade teacher who opposed the time-out room "heard [other fifth-grade] teachers on more than one occasion express resentment toward Ms. Love-Lane for questioning discipline practices" such as their use of the time-out room. J.A. at 364.)

For her part, Love-Lane states that she voiced her concerns about race discrimination in a sincere and respectful way. J.A. 1203-04. Love-Lane's own statements must be credited for purposes of summary judgment, and contrary to what the dissent suggests, *see post* at 41, her position has much support in the record. A number of Love-Lane's fellow staff members at Lewisville, as well as parent-members of the SIT, confirm that her speech and manner were professional and reassuring, not disruptive or disrespectful. *See, e.g.*, J.A. 354 (assistant principal stating that Love-Lane performed her duties "in a professional manner."); J.A. 384 (teacher stating that Love-Lane was

"warm, passionate and professional" and that "[c]hildren, parents and teachers felt comfortable talking with [her]."); J.A. 1166 (teacher stating that Love-Lane was "articulate, genuine, caring, and accessible" in her role as assistant principal); J.A. 414 (teacher stating that Love-Lane "was pleasant to work with and I respected her."); J.A. 397 (teacher's assistant stating that Love-Lane was "an excellent assistant principal" who "had the children's well-being at heart."); J.A. 349 (parent-member of the SIT stating that "Love-Lane was always respectful and professional" in voicing her objections to the time-out room and other disciplinary practices that worked against African-American students). Superintendent Martin himself acknowledged that the "welfare of the students" was not "at risk as a result of any action or in action [sic] by" Love-Lane. J.A. 978. We have thus analyzed the effects of both the content and manner of Love-Lane's speech, and we have done it in a way that is well within the parameters of the cases cited by the dissent. *See e.g., Leary v. Daescher*, 228 F.3d 729, 738 (6th Cir. 2000) (concluding that even though plaintiff-teachers' speech criticizing their school's handling of student discipline "was often conducted in a disrespectful manner," the speech was "of sufficient public importance to outweigh the [school board's] interest in limiting that speech.").

In sum, the evidence, especially when viewed in Love-Lane's favor, shows that her speech did not affect the ability of administrators and teachers at Lewisville to deliver their educational services; nor did her speech diminish the quality of education being provided. But even if Love-Lane's speech — exposing and opposing race discrimination — caused some disharmony at the Lewisville school, we must remember that her speech dealt with a substantial issue of public concern that was of special interest to the larger Lewisville community. In all events, the interests of Love-Lane and the community in her speech are sufficiently substantial to outweigh the efficiency concerns expressed by the defendants.

3.

Last, we consider whether Love-Lane's protected speech was a substantial factor in the decision to transfer her from the administrative position of assistant principal to a high school teaching position. If the causal facts about the reassignment are in dispute, summary

judgment is not appropriate. *Goldstein*, 218 F.3d at 352. We note parenthetically that Love-Lane's transfer or reassignment, which was a demotion in duties and responsibilities, qualifies as an adverse employment action for purposes of her free speech claim. *See DiMeglio v. Haines*, 45 F.3d 790, 806-07 (4th Cir. 1995) (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75-76 (1990)); *Piver*, 835 F.2d at 1078 (assuming that teacher's reassignment to a school located forty miles away would constitute retaliatory action).

Love-Lane must proffer facts to demonstrate that her protected speech was a substantial factor in the decision to remove her from the job of assistant principal at Lewisville and reassign her to a teaching position. On this point we review the record to determine whether a reasonable jury could conclude that Love-Lane's reassignment was "substantially motivated by [her] protected speech; if a reasonable jury could reach this conclusion, then we must remand the case for trial." *Goldstein*, 218 F.3d at 357. The defendants offer several grounds, all allegedly independent of the protected speech, to support their decision to reassign Love-Lane to a teaching position. Specifically, they contend that Love-Lane (1) displayed an unwillingness "to accept constructive criticism" from her supervisors, (2) "refused to acknowledge any responsibility or need to develop better communication skills or better working relationships," (3) "put forth [only] minimal efforts to carry out the role, responsibilities, and functions of an assistant principal," and (4) demonstrated an inability or lack of desire "to rebuild respect and trust [which] adversely affected the administration of staff and Lewisville School." J.A. 481. The Board and Superintendent Martin claim that none of Love-Lane's evidence shows that her protected speech was a factor in their respective decisions. Martin claims specifically that he did not consider Love-Lane's protected speech at all when he made the decision to reassign her to a teaching position. The defendants (and the dissent), however, ignore much of Love-Lane's side of the summary judgment record. Our review of the record reveals that Love-Lane has proffered sufficient circumstantial evidence to establish that her protected speech (her vocal opposition to the discriminatory discipline practices at Lewisville) was a substantial factor in the decision to demote her to a teacher's position. *Cf. Peters v. Jenney*, 327 F.3d 307, 323 (4th Cir. 2003) (vacating grant of summary judgment to defendant where the plaintiff presented limited, but sufficient, evidence of a causal connection

between her speech and the nonrenewal of her contract); *Pike v. Osborne*, 301 F.3d 182, 185 (4th Cir. 2002) (concluding that the plaintiff's evidence of the causal connection between speech and retaliation was sufficient even though it was "thin and circumstantial"). We will recount this evidence.

First, as Love-Lane's speech became increasingly more critical of race discrimination in discipline at Lewisville, her performance evaluations from Blanchfield, the principal, became increasingly more negative. At the end of Love-Lane's first year as assistant principal at Lewisville, before she expressed concerns about the treatment of minority students, she received excellent evaluations from Blanchfield. At the end of Love-Lane's second year, after she had spoken out about discrimination — first in private meetings with Blanchfield, where she was rebuffed, and later at faculty meetings and SIT meetings — Blanchfield gave her lowered evaluations. During her third year, as Love-Lane continued to raise concerns about race discrimination at Lewisville, her relationship with Blanchfield deteriorated even further. Near the end of the third year Blanchfield sent Love-Lane a memo, with a copy to Martin, saying that she (Blanchfield) considered Love-Lane's "continued vocal opposition to our implementation of the Time-Out Room as blatant disrespect for me." J.A. 1268. Blanchfield sent this memo at about the same time that she completed her last evaluation of Love-Lane which rated her as "below standard" or "unsatisfactory" in three areas. Martin, of course, relied on Blanchfield's evaluations in making the decision to reassign Love-Lane.

Second, Martin's own assessment of Love-Lane grew more negative as she continued to speak out about discrimination. Indeed, Martin attempted to discourage or suppress her speech. Love-Lane brought the race discrimination issue to Martin's attention several times. Rather than face up to the issue, however, Martin "seemed more concerned that [Love-Lane] not make waves." Martin actually instructed Love-Lane to "avoid any actions which might cause conflict." J.A. 1210. Love-Lane's job, Martin told her, was not to worry about the children but to please the principal, Blanchfield. Martin admitted that he did not conduct any investigation into Love-Lane's allegations about racially discriminatory practices at Lewisville. J.A. 1364-65, 1413-15. And Martin further admitted that when Love-Lane continued to confront him about her concerns, he "told her that all of

Lewisville's business needs to stay out of my office." J.A. 1306. Finally, Love-Lane told Martin that Blanchfield was giving her lower evaluations because she had spoken out on racial issues. *See* J.A. 661. Martin nevertheless decided that Love-Lane should be removed from her administrative position at Lewisville and transferred to a high school teaching position.

A rational jury could find from these facts that Blanchfield resented Love-Lane's vocal opposition to race discrimination and that she punished Love-Lane for this speech by giving her lower evaluations. A jury could find that Martin, who endorsed Blanchfield's evaluations and reassigned Love-Lane in part because of them, was aware of Love-Lane's speech and Blanchfield's opposition to it. A jury could find that Martin was unwilling to address Love-Lane's concerns about race discrimination at Lewisville and that he even attempted to prevent Love-Lane from speaking out. A jury could find that Martin became increasingly aggravated as Love-Lane continued to bring up the subject of race discrimination at Lewisville. Finally, a jury could conclude that Love-Lane's speech was a substantial factor in the decision to remove her from her job at Lewisville and demote her.

The dissent claims that Martin demoted Love-Lane because of her personality conflict with Blanchfield and her "tone and demeanor." *Post* at 44. Love-Lane's evidence does not allow this conclusion at the summary judgment stage. At the three schools where Love-Lane previously served as assistant principal, she had excellent relationships with her principals. These principals complimented her for her strong skills in communicating and consistently recommended her for promotion. J.A. 1199-2000. Superintendent Martin himself considered Love-Lane to be "an outgoing, people oriented administrator." J.A. 966. Martin considered transferring Love-Lane to Lewisville because Blanchfield had allowed serious racial tensions to develop there. Martin knew that Blanchfield and Love-Lane had different approaches to school administration. Nevertheless, Martin sent Love-Lane to Lewisville as an antidote to the racial tensions and to serve as a role model for African American students. J.A. 966. As it turned out, Love-Lane and Blanchfield did not get along; but when the facts are viewed in Love-Lane's favor, it becomes clear that this case cannot be brushed aside as a "simple personality dispute," as the dissent attempts to do. *See post* at 35. Once Love-Lane went to Lewisville

and assessed the situation, she realized that discriminatory discipline was a major problem. When she began to speak out about the discrimination, she ran into trouble with Martin. She raised her concerns with him, and he told her that he did not want to hear about Lewisville. When Love-Lane persisted in speaking out, Martin demoted her. Love-Lane thus proffers sufficient evidence to raise a jury question about whether her speech was a substantial factor in the decision to demote her.

4.

We conclude that Love-Lane, who was protesting race discrimination in a public school, was speaking out on a matter of public concern. Love-Lane's and the community's interests in her speech outweigh the efficiency concerns of her employer. And, when we view the evidence in the light most favorable to Love-Lane, we conclude that there is a genuine issue of material fact as to whether Love-Lane's speech was a substantial factor in the decision to demote her. The dissent contends that we have reached this conclusion by ignoring defense evidence and by "accord[ing] little respect to the record." *Post* at 44. *See also post* at 35-36. We have not ignored the evidence proffered by the defense. *See supra* at 7-10, 17, 19-20. And we have respected the record because the *entire record* has been our guide. A review of the entire record reveals a factual dispute about the role of Love-Lane's speech in her demotion that must be resolved by a jury. In sum, Love-Lane has at this stage established the elements of a claim that she was retaliated against for exercising her constitutional right to free speech.

B.

Because Love-Lane presents a valid claim for violation of her First Amendment right to free speech, we must decide whether the defendants, the Board and Superintendent Martin, are subject to suit under 42 U.S.C. § 1983. We consider in turn the potential liability of the Board and Martin (the latter is sued in both his official and personal capacities).

1.

To hold a municipality (a local government entity) liable for a constitutional violation under § 1983, the plaintiff must show that the

execution of a policy or custom of the municipality caused the violation. *Hall*, 31 F.3d at 195. "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). To hold a municipality liable for a single decision (or violation), the decisionmaker must possess "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. In this case the Board exercised final review authority over Martin (through the three-person panel of the Board and then the full Board) in approving his decision to demote Love-Lane to a teaching position. Only this action by the Board, which involved the exercise of its final policymaking authority, may serve as the basis for Board liability. *Id.* Thus, the Board cannot be held liable for personnel decisions over which it did not retain final review authority; that is, it is not liable for decisions committed to Martin's discretion because there is no respondeat superior liability under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, the Board is only liable for acts that it has "officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480. This means that Love-Lane must demonstrate that the Board was aware of the constitutional violation and either participated in, or otherwise condoned, it. *See Hall*, 31 F.3d at 196. We conclude that Love-Lane has failed to demonstrate the necessary involvement on the part of the Board.

The minutes of Love-Lane's grievance hearing reveal that Love-Lane did not argue to the Board's three-person panel that either Blanchfield or Martin retaliated against her because she was exercising First Amendment rights. J.A. 278-79. Likewise, Love-Lane's "grievance book," which documented her case to the Board, did not contain anything that would have alerted the Board to her First Amendment claim. J.A. 195-96. Each member of the Board, which upheld Martin's decision after Love-Lane appealed the decision of the three-member panel, stated that his or her decision had nothing to do with Love-Lane's speech. Love-Lane thus offers no evidence that the Board punished her for, let alone was aware of, her opposition to race discrimination at Lewisville. In addition, the Board had before it legitimate grounds for upholding Martin's decision. We conclude that Love-Lane has not produced sufficient evidence to hold the Board liable under § 1983 for a violation of her First Amendment rights. *Cf. Curtis v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1216

(10th Cir. 1998) (holding that there was no school board liability where the "record indicates that Plaintiff did not himself inform the Board, either at the pretermination hearing or in writing, that he believed the recommendation was retaliatory"). Accordingly, the district court properly rejected Love-Lane's First Amendment claim against the Board.

2.

We turn next to Love-Lane's claims against Martin, brought against him in both his official and individual capacities. The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Hicks v. Halifax County Bd. of Educ.*, 93 F. Supp. 2d 649, 667 (E.D.N.C. 1999). As to the First Amendment claim against Martin under § 1983 in his individual capacity, Martin asserts a qualified immunity defense. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We review de novo the district court's determination that Martin is entitled to immunity, viewing the evidence in the light most favorable to Love-Lane. *Gomez v. Atkins*, 296 F.3d 253, 260-61 (4th Cir. 2002). To determine whether Martin is entitled to qualified immunity, we must (1) identify the right allegedly violated, (2) consider whether at the time of the alleged violation the right was clearly established, and (3) determine whether a reasonable person in Martin's position would have known that his actions would violate that right. *Wilson v. Layne*, 141 F.3d 111, 114-15 (4th Cir. 1998). We conclude that Martin is not entitled to qualified immunity.

We have already covered the first step in Part III.A, *supra*, where we examined at length the right allegedly violated and observed that a public employee like Love-Lane has a First Amendment right to protest racially discriminatory practices at her agency without fear of retaliation. The more interesting question is the second, that is, whether the right was clearly established in 1997 and 1998 when Love-Lane was speaking out about race discrimination in discipline at Lewisville and Martin was allegedly retaliating against her. *Pickering* itself, decided thirty years before Love-Lane's speech and demotion, made clear that the core value of the Free Speech Clause of the First Amendment — "[t]he public interest in having free and unhin-

dered debate on matters of public importance" — is so great that a public school "teacher's exercise of [her] right to speak on issues of public importance may not furnish the basis for" an adverse employment decision against her. *Pickering*, 391 U.S. at 573, 574. And *Givhan*, decided nearly twenty years before Love-Lane's speech, made "clear that . . . statements concerning the [s]chool [d]istrict's allegedly racially discriminatory practices involved a matter of public concern." *Connick*, 461 U.S. at 146. Thus, by 1997 it was clearly established that Love-Lane's speech about race discrimination at Lewisville involved a matter of public concern. We have said on many occasions, however, that "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' [under *Pickering*] that is subtle, difficult to apply, and not yet well-defined." *DiMeglio*, 45 F.3d at 806 (citation omitted). But we have never said "that a public employee's right to speak on matters of public concern could *never* be clearly established." *Cromer*, 88 F.3d at 1326. We did the *Pickering* balancing in part III.A, *supra*, and concluded that the subject of Love-Lane's speech was of such heightened public concern that her interest (and the community's) clearly outweighed her employer's interest in efficiency. We noted there, in fact, that Martin admitted outright that Love-Lane's speech did not jeopardize the welfare of the students at Lewisville. In light of this earlier discussion, we are persuaded that the interests to be balanced under *Pickering* weigh so heavily in Love-Lane's favor that her right to speak about race discrimination in a public school was clearly established well before 1997 and 1998. *See Cromer*, 88 F.3d at 1327-29.

The final item in the qualified immunity inquiry is whether a reasonable person in Martin's position would have known that demoting Love-Lane would have violated her right to speak out about race discrimination. We recognize that Martin, as school superintendent, has a very tough job — from handling difficult personnel matters, to satisfying parents, to providing quality education. A superintendent must therefore be accorded a great deal of leeway in managing a school system. Still, by 1997 a reasonable superintendent would surely be aware of a teacher's right to speak out in opposition to race discrimination against elementary school children. And a reasonable superintendent would also know that retaliation taken in response to such

speech is a First Amendment violation, especially when the speech was not disruptive to the point of jeopardizing the welfare of the children. In short, "[a]lthough it may be difficult to delimit exactly what conduct, in the abstract, violates a public employee's first amendment rights," demoting a public school teacher who speaks out against race discrimination in her school in a manner that does not jeopardize the welfare of the students "surely falls within the ambit." *Thompson v. City of Starkville*, 901 F.2d 456, 470 (5th Cir. 1990). Because case law had confirmed Love-Lane's right to speak and because the *Pickering* balancing test tips decidedly in her favor, we hold that any reasonable school superintendent in Martin's position in 1997 and 1998 would have realized that he would violate the Constitution if he, *in fact*, took adverse employment action against Love-Lane for speaking out about race discrimination at Lewisville Elementary School. We emphasize here that any liability on Martin's part hinges on Love-Lane's ability to convince a jury that her reassignment was, *in fact*, retaliation for her exercise of protected speech. We emphasize, too, that we are not holding that every time a public official takes an adverse employment action against an employee who has complained of discrimination, the official risks a trial. *See Cromer*, 88 F.3d at 1330 n.11. "Rather, this is the infrequent case where, after the *Pickering* balancing, the employee had the right to speak as a citizen about extensive and specific claims of racial discrimination." *Id.* Here, Love-Lane assessed the situation at Lewisville for an entire school year, determined that the time-out room and other disciplinary practices discriminated against African American children in specific ways, and complained about this to school officials, at first privately and then more publicly. Surely Martin should have known that Love-Lane could not be disciplined for her speech on such a vital subject. For all of these reasons, we reverse the district court's determination that Martin is entitled to qualified immunity with respect to Love-Lane's free speech claim.

The dissent claims that in denying qualified immunity to Superintendent Martin, we "leave[ ] [top] school administrators in a sea of indeterminancy." *Post* at 48. The majority asks, "What exactly are school administrators in Martin's shoes henceforth supposed to do?" *Post* at 48. The answer is simple. They should do the same thing they were supposed to do before today: hear out, and not retaliate against, an assistant principal (or some other mid-level administrator) who

raises concerns in a professional way about race discrimination in a public school. We should remember that mid-level school administrators, such as Love-Lane, have tough jobs too, for they are on the front lines. The doctrine of qualified immunity does not strip them of clearly established constitutional protections. The superintendent who appreciates this, as most surely do, will not be hindered by today's decision.

C.

In an attempt to broaden its attack on our decision to allow Love-Lane's First Amendment claim to proceed against Superintendent Martin, the dissent in its part IV discusses the importance of maintaining discipline in our public schools. *See post* at 49 ("Keeping order in our nation's schools is among our most pressing educational concerns.") This discussion actually confirms that Love-Lane was speaking out about a matter of substantial public concern when she questioned discriminatory practices in discipline at Lewisville. Indeed, Love-Lane's speech was consistent with her interest in strong discipline. She believes "that children must be taught standards of behavior and they must be required to meet them. If children do not adhere to standards, then [she] believe[s] it is a teacher's responsibility, as a trained professional, to confront the problem and deal with it, not pass it off or give up on the child." J.A. 1204. According to Love-Lane, that is where Lewisville was failing. Too many teachers were using the time-out room to warehouse at-risk children who were often consigned there for minor infractions. Once there, the children, who were mostly African-American, received no instruction. Love-Lane used her First Amendment right to expose this practice.

The dissent also says that in allowing Love-Lane's First Amendment claim to proceed, we are relying on litigation, not democratic discourse, to settle debates about disciplinary methods in public schools. *See post* at 49-50. The dissent is mistaken. We are simply recognizing that the First Amendment allows a school administrator or teacher to debate issues of discipline within the parameters of *Pickering*. Here, the jury will not decide who had the best argument in the debate about discipline at Lewisville. It will decide only whether Love-Lane was demoted because she exercised her First Amendment right to voice concerns about disciplinary practices.

In its part V the dissent contends that our decision will drive good educators to private schools or other options. As we have said, the reasonable administrator who listens to the views of his subordinates and who does not retaliate when a troublesome issue is raised need not fear this opinion. But there is another point. The underprivileged fifth-grade student who is warehoused in a time-out room does not have the option of going to a private school or somewhere else. This student has been abandoned at the end of the road unless someone, like Love-Lane, is able to speak up for him.

IV.

Love-Lane contends that the district court erred in granting summary judgment to the Board and Martin on her claims that she was discriminated against because of her race when she was demoted. Love-Lane asserts her discrimination claims under three federal statutes, Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Love-Lane proffers a circumstantial case, and the elements required to establish such a case are the same under all three statutes. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993); *Thompson*, 312 F.3d at 649 n.1. Specifically, the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Under the *McDonnell Douglas* proof scheme the plaintiff must first establish a prima facie case of discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 506. Once the plaintiff establishes her prima facie case, the defendant must respond with evidence that it acted with a legitimate, non-discriminatory reason. *See id.* at 506-07. If the defendant makes this showing, the plaintiff must then present evidence to prove that the defendant's articulated reason was pretext for unlawful discrimination. *See id.* at 507-08. Although the evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, "[t]he ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). We conclude in this case, for the reasons set forth below, that while Love-Lane establishes a prima facie case of race discrimination, she does not proffer sufficient evidence of pretext to overcome the defendants' legitimate, non-discriminatory reason for their decision to demote her. (To the extent that the Supreme Court's recent decision in *Desert Palace, Inc. v. Costa*, 539 U.S. ___, 123 S. Ct. 2148 (2003), might change the role that the *McDonnell Douglas* burden-shifting framework plays in race discrimination cases, *see Dare v. Wal-Mart Stores, Inc.*, 267 F. Supp. 2d 987 (D. Minn. June 13, 2003), any change would not prevent the entry of summary judgment against Lane-Love on her race discrimination claims. As our discussion will show, Love-Lane does not "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race . . . was a motivating factor'" in her demotion. *Desert Palace*, 123 S. Ct. at 2155.)

### A.

To establish her prima facie case that the defendants' decision not to renew her administrative contract and to reassign her to a teaching position was discriminatory, Love-Lane must show that (1) she is a member of a protected class, (2) she was qualified for her job and her performance was satisfactory, (3) despite her qualifications she was removed from her assistant principal's position and reassigned to a teaching position, and (4) the assistant principal's position remained open to similarly qualified applicants after her reassignment. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

First, Love-Lane, who is African American, is a member of a protected class. *See* 42 U.S.C. § 2000e-2(a)(1). Second, Love-Lane's evidence creates a genuine issue of fact as to whether her job performance was satisfactory at the time of her reassignment. There is no denying that by Love-Lane's third year at Lewisville, her rapport with Blanchfield, as well as with several teachers, had deteriorated substantially, and her performance evaluations reflected that.

Love-Lane offers evidence, however, that she continued to perform her job at a satisfactory level despite the problems with Blanchfield and certain teachers. While the defendants offer evidence that Martin and other top administrative officials independently evaluated Love-Lane's work performance and found it to be substandard, Love-Lane's evidence indicates that she was open to feedback and constructive criticism, made efforts to get along with Blanchfield and other staff members at Lewisville, and conducted herself overall in a professional and respectful manner. In fact, even on her last performance evaluation in the late spring of 1998, Love-Lane received ratings of standard or above in eight out of eleven evaluation categories. J.A. 292-96. She received a rating of "well above standard" for her work in planning the school program, which included assisting in developing the goals and objectives of the school, providing direction to staff, and contributing to the planning of the instructional program. J.A. 292. Love-Lane has thus created a genuine issue of material fact as to whether she was performing at a satisfactory level at the time of her reassignment. Third, we assume here, as did the district court, that Love-Lane's removal from her administrative position and reassignment to a teaching position (a demotion) constitutes an adverse employment action for purposes of Title VII. *Cf. Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) (noting that Title VII liability can arise from "reassignment with significantly different responsibilities") (internal quotation marks and citation omitted). Fourth, neither side disputes that Love-Lane's assistant principal position remained open to similarly qualified applicants after her reassignment. In sum, Love-Lane can establish each of the four elements of a prima facie case of race discrimination.

B.

Because Love-Lane has established a prima facie case of race discrimination, the burden shifts to the defendants to offer a legitimate, nondiscriminatory reason for Love-Lane's reassignment. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). The defendants contend that Love-Lane was reassigned because she demonstrated a complete inability to work effectively under Blanchfield and because she failed to meet the expectations laid out for her by Martin in his October 1997 memo. (Martin's memo warned Love-Lane that she had to respect the authority of her principal, register her disagree-

ments in private, and rebuild trust. J.A. 979-80.) This explanation is sufficient to shift the burden to Love-Lane, who must show that "the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

Love-Lane fails to proffer sufficient evidence of pretext. We recognize, of course, that we held in part III that a reasonable jury could conclude that Love-Lane was retaliated against for speaking out on race issues in violation of her right to free speech. But the fact that Love-Lane has a viable free speech claim does not automatically mean that she has a viable race discrimination claim. To reach a jury on her race discrimination claims, Love-Lane must demonstrate — apart from demonstrating that she was reassigned in retaliation for her speech on race issues — that she was reassigned "because of" her race. That, we conclude, she cannot do. Because, as we have already concluded, Love-Lane presents a genuine issue of material fact as to whether she was reassigned to a high school teaching position in retaliation for her vocal opposition to race discrimination, it follows that her evidence casts some doubt on the defendants' assertion that they had legitimate, nondiscriminatory reasons for reassigning her. But that doubt has nothing to do with Love-Lane's race. That is, none of Love-Lane's evidence that she was reassigned in retaliation for her speech suggests that she was reassigned because of her race. Simply because Love-Lane presents evidence that the defendants' justification for their adverse employment decision may be false does not mean that Love-Lane's evidence demonstrates pretext for race discrimination. "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [Love-Lane's] proffered reason . . . is correct." *Reeves*, 530 U.S. at 146-47 (internal quotation marks and citation omitted). It is not enough to disbelieve the defendants here; the fact-finder must believe Love-Lane's explanation of intentional race discrimination. *Id.* at 147. We conclude that no rational jury could do so based on the evidence in the record. Love-Lane's evidence demonstrates that racial tensions were high at Lewisville during the Blanchfield administration and that Blanchfield herself made racially insensitive comments, though none directed at Love-Lane, on at least two occasions. Love-Lane did claim that Blanchfield's reprimand following the June 1997

altercation was the result of racial bias. But an independent investigation into Love-Lane's allegations uncovered no evidence of racial bias or animus on Blanchfield's part. Love-Lane provides no further facts from which a jury could infer a discriminatory bias or animus on the part of Blanchfield, let alone on the part of Martin or the Board, that led to Love-Lane's reassignment. Love-Lane does not even allege that the decisions of Martin or the Board were motivated by racial bias or animus. Love-Lane's evidence demonstrates only that she and Blanchfield "did not see eye-to-eye. . . . [T]his showing of a difference of opinion, coupled with [Love-Lane's] conclusory allegations of racism, cannot reasonably support the conclusion that [Love-Lane's reassignment] was motivated by racial animus." *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000). Because, on the one side, there is substantial evidence that the defendants' articulated justifications for Love-Lane's dismissal were not pretext for race discrimination and, on the other side, there is only Love-Lane's unsupported opinion that her reassignment was based on improper discriminatory intent, we cannot conclude that she has proffered evidence of pretext sufficient to withstand the defendants' motion for summary judgment on the discrimination claims. *Cf. id.*; *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989). We therefore affirm the award of summary judgment to the defendants on the federal race discrimination claims.

V.

Finally, we turn to Love-Lane's claims against the Board and against Martin in his individual and official capacities for the violation of her right to free speech under Art. I, § 14 of the North Carolina Constitution and for race discrimination in violation of Art. I, § 19 of the North Carolina Constitution. Claims brought under the North Carolina Constitution may be asserted only against state officials acting in their official capacities. *See DeWitt v. Mecklenburg County*, 73 F. Supp. 2d 589, 605-06 (W.D.N.C. 1999) (citing *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 293 (N.C. 1992)). Thus, the district court correctly dismissed the state constitutional claims against Martin in his individual capacity. In addition, a plaintiff whose rights under the North Carolina Constitution have been violated may pursue an action directly under the state constitution only if there is no other remedy under state law to redress the violation. *Corum*, 413 S.E.2d at 289. In

this instance, Love-Lane could have brought an action in state court under N.C. Gen. Stat. § 115C-287.1(d) seeking review of the decisions of the Board and Martin. Because Love-Lane had this remedy available under North Carolina statute, she is barred from pursuing her state constitutional claims here. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995); *Alt v. Parker*, 435 S.E.2d 773, 779 (N.C. App. 1993). Accordingly, we affirm the district court's grant of summary judgment to the Board and Martin on Love-Lane's state constitutional claims.

## VI.

In sum, we vacate the district court's grant of summary judgment to Martin in his individual capacity on Love-Lane's First Amendment claim under 42 U.S.C. § 1983, and we remand for further proceedings on that claim. Otherwise, we affirm the district court's grant of summary judgment to the Board and to Martin (in his official capacity only) on Love-Lane's First Amendment claim under § 1983, to the Board and Martin on Love-Lane's race discrimination claims, and to the Board and Martin on Love-Lane's claims under the North Carolina Constitution. The dissent says that our decision to allow Love-Lane's First Amendment claim to go forward will "undercut the standards that challenge students and the expectations that form the essence of education itself." *Post* at 49-50. That is a solemn pronouncement, but is not true. The standards and expectations that shape public education are not undercut when we follow precedent, as we have today, and protect the right of a mid-level school administrator to speak out against race discrimination in her school.

*VACATED IN PART, AFFIRMED IN PART, AND REMANDED.*

WILKINSON, Circuit Judge, dissenting:

I appreciate the majority's thoughtful opinion in this case. I cannot join it, however, because it does public education too much harm. In what are surely some of the toughest jobs in America, principals and superintendents struggle to deal with troubled schools, budget deficits, and teacher shortages. Sadly, their jobs just got even harder. At issue here is nothing more than Superintendent Don Martin's decision to separate Brenda Blanchfield and DeComa Love-Lane, two admin-

istrators embroiled in a personality conflict that was diverting energy from the education of young children. To strip a superintendent of qualified immunity for this sort of personnel action is an extraordinary step. After all, the whole purpose of qualified immunity is to preserve a degree of discretion and latitude on the part of those who run our nation's public schools. Principals' and superintendents' decisions are inevitably going to disappoint at least some combination of teachers, students, parents, and the public. These beleaguered officials will now find themselves fettered by yet another constraint: the constant concern that their routine decisions will give rise to federal lawsuits.

Moreover, the majority's decision gives rise to a circuit conflict. In evaluating Martin's interest in reassigning Love-Lane, the majority considers only the substance of Love-Lane's speech, and not the disruption caused by Love-Lane's lack of tact and confrontational manner. The majority's narrow focus is out of step with decisions of the Supreme Court, of our own court, and of our sister circuits, which have consistently found that employers are not required to ignore the intemperate tone or unprofessional manner in which employees may choose to express themselves. *See* Part II.B, *infra*. Speech in an office setting is simply different from, for example, speech in a classroom, speech in a campaign, or speech on the street. While speech in the public square may profitably be caustic and even vitriolic, that same type of speech in the workplace can rend the fabric of important relationships and interfere with the provision of valuable services to the public. The majority's holding to the contrary will work to the detriment not simply of public school systems, but of public offices throughout this circuit.

I agree with my colleagues that Love-Lane had an opportunity to make an important contribution to race relations at Lewisville. I agree further with the majority that it is important to have honest discussion on matters of race. If the record showed that Martin had reassigned Love-Lane for her speech on racial issues, I would unreservedly join the majority's opinion. Instead what the record reveals, and what the district court found, is that Love-Lane was reassigned for speaking out on a number of issues, most of which had nothing to do with race, in such an intemperate manner that it disrupted the school in which she was working. A host of teachers and administrators — female and male, African-American and Caucasian — found Love-Lane's man-

ner harsh and uncivil. By turning a blind eye to this evidence, the majority's decision will handicap principals and superintendents who labor to create environments in which education can move forward. The ultimate cost, however, will be borne by students of all races and walks of life who will be denied the opportunity for more effective learning.

Part I of this dissent demonstrates the correctness of the district court's view that the personal relationship between Brenda Blanchfield and DeComa Love-Lane had become so contentious as to require a new management team at Lewisville Elementary. Part II explains why the majority is mistaken in concluding that Love-Lane has a First Amendment claim for retaliatory discharge, and details the adverse effects for public schools that flow from the majority's decision. Part III describes the more troubling consequences of the majority's second blow to public school administration — that of denying even qualified immunity to principals and superintendents for their ordinary personnel decisions. Part IV discusses the implications of the majority's analysis not only for school administration, but for school discipline. Finally, Part V reflects briefly on the burdens that litigiousness is imposing on public education vis-á-vis other forms of education. For as important as private and home schooling are, America will never fulfill the true promise of pluralism without a strong public education system.

I.

A look at what transpired at Lewisville Elementary School between 1995 and 1998 makes clear that a simple personality dispute has been misleadingly cloaked in constitutional clothing. Taking the facts in the light most favorable to DeComa Love-Lane, as we must, does not mean ignoring facts unfavorable to Love-Lane that are not in dispute. Teachers and administrators, whatever their gender or race, found Love-Lane's demeanor unprofessional and contentious. By failing to consider this uncontroverted evidence, the majority converts an ordinary personnel decision into a constitutional cause of action.

In the summer of 1995, Dr. Donald Martin, Superintendent of the Winston-Salem Forsyth County Schools, named DeComa Love-Lane an assistant principal at Lewisville Elementary in Lewisville, North

Carolina. During Love-Lane's three-year tenure at Lewisville, she came into conflict with both teachers and other administrators, especially Brenda Blanchfield, Lewisville's principal and Love-Lane's immediate superior. It was this breakdown in Love-Lane's working relationships, and not Love-Lane's exercise of speech protected by the First Amendment, that drove Martin's decision to reassign her to a teaching position.

Love-Lane's difficulties at Lewisville began during the 1996-97 school year as a result of Love-Lane's opposition to the school's time-out room. Lewisville's time-out room was an intermediate step between in-class discipline and out-of-school suspension for students whose classroom behavior was disruptive. It was similar to those of many other schools, and its operation was governed by extensive procedures and overseen by a discipline committee. J.A. 269, 329-30, 744-47, 1267. The time-out room was recommended by a School Improvement Team composed of teachers and parents, and its use was approved by Blanchfield. J.A. 1266. It was also voted on and endorsed by Lewisville's entire staff at a faculty meeting in September 1996. J.A. 740, 1266. Love-Lane objected at the meeting that the room adversely impacted minority students. After the meeting several teachers complained to Blanchfield that Love-Lane had called them "unprofessional" for supporting the program. J.A. 131, 740, 823, 955, 1153. Love-Lane continued to oppose the program even after the meeting.

This dispute over use of the time-out room may have foreshadowed future conflict between Love-Lane and others at Lewisville, particularly Blanchfield. However, it was not nearly so central to the ongoing conflict as Love-Lane suggests. In fact, relations between Blanchfield and Love-Lane steadily deteriorated throughout the spring of 1997 over a host of other issues that had little to do with disciplinary practices or their impact on minority students. These issues included bus loading and unloading, a first-grade teacher's absence from the playground during recess, a kindergarten teacher's treatment of her students, a disagreement within the custodial staff, and Blanchfield's annual evaluation of Love-Lane. J.A. 858-59, 866-69, 968-69, 1252. To take but one example, Love-Lane disagreed with Blanchfield's instructions about where Love-Lane should stand during bus loading and unloading. When Blanchfield was not present,

Love-Lane ignored her instructions and did not stand where Blanch-field had requested. J.A. 187-88

Many of these administrative disagreements were aired in increasingly angry memos sent by Love-Lane and Blanchfield to each other, and copied to Superintendent Martin and Assistant Superintendent Ron Montaquila. J.A. 858-60, 866, 868-69. Before long Montaquila was called in to mediate, and he sat in on numerous conferences at the disputants' request. These conferences typically lasted several hours, and, according to Montaquila, they usually degenerated into lengthy harangues by Love-Lane about her frustration with Blanchfield. J.A. 1002-03. Montaquila relayed to Martin both the substance of the conferences and their ineffectiveness in improving relations between Blanchfield and Love-Lane. J.A. 1004.

Martin then intervened personally beginning late in the spring of 1997, and his observations over the course of several meetings were the same as Montaquila's. J.A. 968-69. In November 1997, Amanda Bell took over for Montaquila as the assistant superintendent in charge of Lewisville. Like Montaquila and Martin, Bell had numerous lengthy meetings with Blanchfield and Love-Lane. And like Montaquila and Martin, Bell observed that Love-Lane frequently voiced disagreement with Blanchfield in a disrespectful and intemperate manner; she defied Blanchfield's instructions on even minor matters; and she did not respond favorably to Martin's constructive criticism. J.A. 289. These were the reasons that Bell, herself an African-American female, concluded that Love-Lane was having problems at Lewisville — not because Love-Lane was speaking out on minority issues. J.A. 290.

Martin's concerns about Love-Lane's effectiveness as an administrator were amplified on the last day of school before the 1997 summer recess, when Love-Lane and a teacher, Angie Anderson, were involved in a heated confrontation in the hallway outside Love-Lane's office. Their disagreement concerned whether Anderson had questioned one of Love-Lane's decisions in regard to some teaching materials. Three separate investigations of the incident were conducted by Blanchfield; Montaquila; and David Fairall, the human resources manager for the school system. All three concluded that both Love-Lane and Anderson had used profanity and otherwise acted unprofes-

sionally. When Love-Lane objected to these findings, Martin appointed John Siskind, a paralegal for the school district, to perform an independent investigation. J.A. 968. After conducting his own interviews, Siskind agreed with Blanchfield, Montaquila, and Fairall that Love-Lane had used profanity and behaved inappropriately. J.A. 1030, 1033-35. At that point, after four investigations had reached precisely the same conclusion, Martin placed a letter of reprimand in Love-Lane's file. J.A. 975A.

The incident between Love-Lane and Anderson only further strained the ability of Blanchfield and Love-Lane to get along. In October 1997, Martin authored a memo to them that addressed the breakdown in their working relationship and its adverse effect on the administration of Lewisville Elementary. J.A. 473. Rather than assign blame, Martin charged Blanchfield and Love-Lane with rebuilding their relationship and achieving the loyalty, trust, and mutual respect necessary to function effectively as an administrative team. J.A. 473.

Unfortunately, Love-Lane's working relationships with others in the school system further declined during the 1997-98 school year. For example, in January 1998 Love-Lane had a meeting with the six fifth-grade teachers at Lewisville. The teachers came away so upset by Love-Lane's tone during the meeting that the entire group requested they be assigned a new administrator for the rest of the school year. J.A. 728-29. When Blanchfield repeatedly declined their request, several of the teachers took the unusual step of appealing to Martin himself. J.A. 970-71. In the process, the teachers complained about Love-Lane's poor communication on issues like a grant proposal, school-sponsored sleepover, and food drive. J.A. 725, 727-31, 957-58. Notably, as with the earlier disputes between Blanchfield and Love-Lane over administrative tasks like bus duty, these disagreements had nothing to do with Love-Lane's speech on racial issues.

By this point, Martin had devoted considerable time and energy to Love-Lane's disagreements with others at Lewisville. Neither Bell nor Montaquila felt that Love-Lane had responded encouragingly to their suggestions for improvement, and this squared with Martin's own observations. Martin then did precisely what he had outlined in his October 1997 memo to Blanchfield and Love-Lane: he reorganized the administrative team at Lewisville Elementary, because

Blanchfield and Love-Lane had been unable to establish an effective working relationship. Blanchfield was transferred to the central office, receiving a substantial reduction in her salary. J.A. 971-72. And Love-Lane was reassigned to a teaching position for the 1998-99 school year. J.A. 971, 986.

Love-Lane filed a formal grievance with the school board in response to her reassignment. The board specifically found that Martin's decision was amply supported by the performance evaluations of Love-Lane, the results of the investigations into the incident between Love-Lane and Anderson, and Love-Lane's failure to achieve the standards set out in Martin's October 1997 memo. J.A. 281-84, 327. Love-Lane did not present the board with any evidence that her reassignment was in retaliation for her speech on racially charged issues. J.A. 278-79. Rather, all of the evidence submitted to the board by both Love-Lane and Martin indicated that Love-Lane believed she was being harassed and sabotaged by Blanchfield, while Blanchfield believed she was being disrespected and undermined by Love-Lane. J.A. 278-81. In short, this was a bitter and acrimonious dispute between two employees. Martin wanted them to function as a team, and when they proved unable to do so, he did what sensible employers often do: he lessened their professional responsibilities. It is important moreover that Martin in no way singled out Love-Lane for reassignment. Instead, he sought to restructure the entire administrative team.

## II.

The doctrine of qualified immunity exists precisely so that government officials can make reasonable discretionary decisions without the paralyzing fear of legal liability. *See, e.g.*, *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (en banc) ("Qualified immunity thus allows officials the freedom to exercise fair judgment. . . ."). Qualified immunity therefore protects government officials "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). In addressing this question, we do not impose on officials "a duty to sort out conflicting decisions or to resolve subtle or open issues. 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *McVey v. Stacy*,

157 F.3d 271, 277 (4th Cir. 1998) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

Simply put, Martin's decision to reassign Love-Lane to a teaching position transgressed no bright line; it violated no clearly established constitutional right. Indeed, it is unlikely that Martin's decision to reassign Love-Lane violated her right to free speech at all. To determine whether Love-Lane even has a cause of action under the First Amendment for retaliatory demotion, we must balance Love-Lane's interest in commenting upon matters of public concern against the school system's interest in providing effective educational services at Lewisville Elementary. *McVey*, 157 F.3d at 277 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)); Thus we must ascertain (1) whether Love-Lane was speaking as a citizen upon a matter of public concern or as an employee upon a matter of personal interest; (2) whether Love-Lane's interest in speaking on the matter of public concern outweighed the school system's interest in providing effective educational services; and (3) whether Love-Lane's speech was a substantial factor in Martin's decision to reassign her. *Id.* at 277-78. I shall address the three prongs of the inquiry in turn.

## A.

The first question is whether Love-Lane was even speaking as a citizen upon a matter of public concern or rather as an employee upon a matter of personal interest. Insofar as Love-Lane objected to Lewisville's use of the time-out room because of its alleged discriminatory impact on minority students, she may well have been speaking on a matter of public concern. Yet any administrator or teacher is likely over time to speak out on some matter of concern to local parents and residents. This ought not convert a routine personnel decision into a constitutional infraction. After all, Love-Lane expressed herself on a whole host of issues, from bus duty to her own performance evaluation, that were purely internal matters of school administration.

In fact, it was Love-Lane's expression on these administrative matters, not her opposition to the time-out room, that drove her difficulties at Lewisville. The majority's claim that "teachers and administrators who took offense at Love-Lane's manner or tone also took offense at the content of her speech opposing race discrimina-

tion" finds no support in the record. *Ante* at 17. For instance, in the four pages of complaints about Love-Lane presented by the fifth-grade teachers to Blanchfield and then Martin, the teachers do not even mention Love-Lane's opposition to the time-out room or any other disciplinary practice. J.A. 727-28, 730-31. In the extensive documentation compiled by the four separate investigations of the argument between Love-Lane and Angie Anderson, there is no hint that Love-Lane's opposition to any disciplinary practice, including the time-out room, was a factor in the confrontation. J.A. 845-47, 877-79, 943-45, 1033-35. In Love-Lane's many lengthy memos to Blanchfield, Martin, and Montaquila throughout 1997, she does not include her opposition to any disciplinary practice as a source of friction between her and others at Lewisville. J.A. 858-60, 866-67, 871-72, 1011, 1251.

Indeed, even as late as the board hearing on Love-Lane's reassignment, Love-Lane and her counsel maintained that the disagreements between Blanchfield and Love-Lane were "personal in nature" and that Love-Lane's career "was being sabotaged by Ms. Blanchfield." J.A. 278-79. Love-Lane never argued, and thus the board never considered, that she was being retaliated against for having spoken out on allegedly discriminatory practices at Lewisville. For Love-Lane to argue now that her reassignment resulted from her opposition to the time-out room, she must assign hugely disproportionate weight to the fraction of her speech that touched on a matter of public interest. Portraying Love-Lane's speech as primarily of public concern is more the product of counsel's post-hoc creativity than of any actual events at Lewisville.

The majority gets it backward, then, when it says the dissent's focus is too limited. *See ante* at 15. The point is that Love-Lane's speech on allegedly discriminatory practices was but a small part of her tenure at Lewisville. When one examines the "context" of Love-Lane's speech "as revealed by the whole record," it could hardly be clearer that Love-Lane and others were at odds over a slew of matters having no connection to public concerns. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Relationships foundered and deteriorated over the day-to-day details of school administration, and they became poisoned to the point where someone in charge simply had to make a change.

B.

Even if one were to overlook the fact that the bulk of Love-Lane's speech bore no relation to matters of public concern, Love-Lane's interest in expressing herself still must be weighed against the interest of the Board and the Superintendent in "discipline, morale and good working relationships" at Lewisville Elementary. *Cromer v. Brown*, 88 F.3d 1315, 1328 (4th Cir. 1996); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). The district court properly found that Martin's interest in maintaining an orderly, effective administration at Lewisville outweighed Love-Lane's speech interest.

Indeed, the district court conducted an extensive review of the record in this case, and it emphatically concluded that Love-Lane had proceeded in a confrontational manner disruptive to Lewisville's operation. According to the district court, Love-Lane

> antagonized and insulted those who used the Time-Out Room and refused to assist the Time-Out Room coordinator in its administration. She failed to develop effective working relationships with other staff, driving some to appeal to the superintendent to replace her. She used profanity in an inappropriate confrontation with a teacher. She resisted feedback or constructive criticism. She repeatedly challenged her principal's judgment. She refused to rebuild an effective working relationship with Blanchfield. . . .

In the face of all this, it simply blinks reality to claim that Love-Lane's difficulties with others at Lewisville "did not affect the ability of administrators and teachers at Lewisville to deliver their educational services." *Ante* at 18. When Blanchfield and Love-Lane were constantly at each other's throats; when Love-Lane and Anderson were shouting at each other in the hallways; or when an entire group of teachers were complaining that they had been repeatedly undermined by Love-Lane, the effective operation of Lewisville Elementary had given way to internal divisiveness. And that is to say nothing of the time and energy that Martin, Bell, and Montaquila each had to devote to the incessant conflict at Lewisville. In fact, in his October 1997 memo to Blanchfield and Love-Lane, Martin wrote that theirs

was the most acrimonious and divisive conflict between two administrators he had ever seen. J.A. 976.

In the face of such protracted infighting, Martin concluded that the effective administration of Lewisville was being hampered. He did not jump to this conclusion, and he did not assign either Blanchfield or Love-Lane exclusive blame. He simply believed that the situation had to be changed. Martin's professional judgment in this regard is entitled to respect. "When close working relationships are essential to fulfilling public responsibilities, *a wide degree of deference* to the employer's judgment is appropriate." *Connick v. Myers*, 461 U.S. 138, 151-52 (1983) (emphasis added). We need not rely on Martin's subjective judgment that Love-Lane's speech harmed cohesiveness and efficiency at Lewisville. Rather, there was ample objective evidence that underpinned Martin's judgment and on which the district court relied.

The majority shows no deference at all to Martin's judgment, largely because it focuses only on the disruption caused by the substance of Love-Lane's speech, and not on the disruption caused by Love-Lane's antagonistic manner. Yet in weighing the interests of Love-Lane and the school system, Love-Lane's speech "[is] not [to] be considered in a vacuum; the *manner*, time, and place of [Love-Lane's] expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (emphasis added). We have repeatedly balanced the respective interests not merely in terms of the "subject" on which the employee speaks, but also in terms of the "manner, time, and place" in which an employee elects to express himself. *DiMeglio v. Haines*, 45 F.3d 790, 805-06 (4th Cir. 1995); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999).

The majority's narrow focus is thus out of step with decisions of the Supreme Court, of our own court, and of our sister circuits, which have consistently found that employers are not required to ignore the intemperate tone or confrontational manner in which employees may choose to express themselves. *See, e.g.*, *Craven v. University of Colorado Hosp. Auth.*, 260 F.3d 1218, 1228-29 (10th Cir. 2001) (relying on abrasive, offensive manner of employee's speech); *Leary v. Daeschner*, 228 F.3d 729, 738 (6th Cir. 2000) (noting disruptive man-

ner of teachers' speech, including yelling at colleagues and consistently questioning the principal's authority); *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994) ("Here, the outcome of a *Pickering* balance is especially uncertain because the manner of Hansen's speech was vulgar, insulting, and defiant."); *Germann v. City of Kansas City*, 776 F.2d 761, 764-65 (8th Cir. 1985) (discussing harsh and distrustful tone of employee's letter as important factor in *Pickering* balancing); *McBee v. Jim Hogg County, Tex.*, 730 F.2d 1009, 1017 (5th Cir. 1984) (en banc) (considering whether employee's speech was "sufficiently hostile, abusive or insubordinate as to disrupt significantly the continued operation of the [employer's] office").

It makes little sense to consider whether the substance of Love-Lane's speech harmed morale, close working relationships, or institutional efficiency, and yet not consider whether her tone or manner did precisely the same thing. "[T]he employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 415 n.4 (1979). How one says something, in addition to simply what one says, can undermine the morale and close working relationships essential to a productive workplace.

Of the dozens of witnesses whose statements appear in the record, not a single member of Lewisville's administration or the school system's central office says that Love-Lane acted professionally. As a result, the majority relies primarily on Love-Lane's own assertions that she never acted unprofessionally, but Love-Lane's assertions are entirely unsupported by the record. Four investigations of the Anderson incident concluded that Love-Lane had acted unprofessionally; her principal and the faculty had been alienated by a series of incidents having nothing to do with race; and of course every administrator who intervened at Lewisville, regardless of their gender or race, found Love-Lane's tone and demeanor inappropriately hostile. The majority does not dispute any of this evidence; it simply ignores it.

The majority instead repeatedly points out that this case arises on a motion for summary judgment. *See ante* at 12, 15, 17, 19 -20, 22. And on that, we certainly agree. In ignoring the wealth of undisputed facts, however, the majority accords little respect to the record or to

the views of school administrators. *See, e.g.*, *Connick*, 461 U.S. at 151-52 (according "a wide degree of deference" to school officials' views). Only by failing to consider the way in which Love-Lane spoke can the majority avoid what was obvious to the school system's administrators and to the district court: that the manner in which Love-Lane expressed herself served to "disrupt [Lewisville], undermine [Blanchfield's] authority, and destroy close working relationships." *Connick*, 461 U.S. at 154.

C.

Thirdly and finally, the majority cannot demonstrate that Love-Lane's speech was a substantial factor in her reassignment. None of the evidence marshalled by the majority establishes that Love-Lane was targeted as a result of her stance on allegedly discriminatory practices. *See ante* at 20-21. Blanchfield did lower Love-Lane's evaluations over time, particularly in the area of communication skills, but that was because Love-Lane had increasingly clashed with members of the faculty. And Blanchfield did consider Love-Lane's "continued vocal opposition to [Lewisville's] implementation of the Time-Out Room as blatant disrespect for [Blanchfield] . . . and [Lewisville's] School Improvement Team." Yet Love-Lane was protesting a program that Blanchfield individually and the faculty collectively had approved. It had been operating for two years as a result of the combined efforts of teachers, parents, and administrators. By this point, Blanchfield might reasonably expect that a member of her own administrative team stop openly attacking a program that she, the faculty, and the local community had supported. Blanchfield was upset with Love-Lane not for the substance of her views, which might well have been communicated in any number of constructive ways. Rather, Blanchfield was upset that Love-Lane seemed intent on continually and confrontationally undermining Blanchfield's authority with her own staff and the local community.

Regardless, focusing on the disputes between Blanchfield and Love-Lane misses the real point. None of this evidence demonstrates that *Martin* retaliated against Love-Lane for her speech. While Martin did consider Blanchfield's evaluations of Love-Lane, he also considered all of the incidents on which those evaluations were predicated: the investigations into the altercation with Angie Anderson, the

reports of Montaquila and Bell, the grievance filed by the fifth-grade teachers, and his own first-hand observations of Love-Lane's attitude and demeanor. None of these incidents related to Love-Lane's protest against allegedly discriminatory practices. They related instead to Love-Lane's and Blanchfield's unfortunate personality conflict — a conflict which, to repeat, was resolved evenhandedly by removing from Lewisville both of the offending parties.

### III.

Whether Love-Lane has any viable claim under *Pickering* for retaliatory demotion is thus far from certain. The bulk of Love-Lane's speech did not involve matters of public concern; the school system's interest in the efficient administration of Lewisville was substantial and entitled to deference; and Martin possessed ample grounds for reassigning Love-Lane that had absolutely nothing to do with her speech on racial issues. Yet even assuming that Love-Lane has established a free speech claim, her claim is hardly so clearly established that Martin should have known he was acting unlawfully when he reassigned her.

My friends in the majority, however, would strip Martin even of qualified immunity. This is incorrect. It was quite reasonable for Martin to conclude that Love-Lane's "interest in First Amendment expression" did not outweigh the school system's "interest in efficient operation of the workplace." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000) (quoting *Hanton v. Gilbert*, 36 F.3d 4, 6-7 (4th Cir. 1994)). "Just as an employee has a right to speak — even at work — public employers have the right to run efficient, functional operations." *Id.* at 351. This is especially true since "only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) (internal quotations omitted).

The district court properly found that the difficult balance sought here — measuring Love-Lane's free speech interest against the school district's interest in the efficient operation of its schools — was any-

thing but clearly established. While "'there need not be a prior case directly on all fours with the facts presented to the official,'" it must be clear that "in light of pre-existing law, the unlawfulness of the challenged action was apparent to the official." *Cromer v. Brown*, 88 F.3d 1315, 1325 (4th Cir. 1996) (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995)).

Yet pre-existing law supported the legality of Martin's decision. The disruptiveness of Love-Lane's conduct gave Martin every reason to believe that the *Pickering* balance swung in the school system's favor. Indeed, what the majority deems clearly established is actually a sharp departure from our precedents. For instance, in *Cromer* we denied qualified immunity to a sheriff who had allegedly retaliated against a deputy for protesting racial discrimination within the sheriff's department. *Cromer*, 88 F.3d at 1331. The deputy was one of over thirty minority law enforcement officers who had slipped a private letter alleging racial discrimination under the sheriff's door. *Id.* at 1320 & n.2. In performing the *Pickering* balancing test, we specifically relied upon the fact that the officers' concerns "were presented in a non-confrontational way that did not appreciably affect the sheriff's efficiency interests." *Id.* at 1330 n.11. Here, in contrast, Love-Lane's concerns were presented in a confrontational way that disrupted Lewisville and soured working relationships with Blanchfield, Martin, Montaquila, Bell and much of Lewisville's faculty.

In short, at the time Martin decided to reassign Love-Lane in 1998, prior cases would not have given him any reason to believe that he was acting unlawfully — much less that his unlawfulness was clearly established. The Supreme Court's prior case law, not to mention our own, did not require Martin to ignore reports of obscenity-laden shouting matches in Lewisville's hallways; widespread complaints from his teachers, and indeed his own subordinates, about Love-Lane's unprofessional manner; and evidence of a bitter feud between members of Lewisville's administrative team. Had Martin done nothing, and allowed the situation at Lewisville to deteriorate further, he would have been an ineffectual school superintendent.

One cannot help but wonder what the majority would now require of superintendents like Martin. All told, Martin waited for two years, conducted innumerable conferences and investigations, and person-

ally involved himself in attempts at improvement, while the situation at Lewisville steadily declined despite his efforts. What exactly are school administrators in Martin's shoes henceforth supposed to do? The majority notes vaguely that they should "hear out" someone's "concerns," *ante* at 26-27, but that is *exactly* what Martin did — not just once, but over and over and over again. Administrators like Martin may be forgiven, then, for doubting that they "will not be hindered by today's decision." *Ante* at 27. Because the *Pickering* balance is itself uncertain, the denial of qualified immunity to the defendant leaves school administrators in a sea of indeterminacy. The majority has reached the point where litigation outcomes are so uncertain, that the prospect of liability deprives those in positions of responsibility of the chance to take steps that may demonstrate educational leadership and earn a community's respect.

IV.

The majority's decision thus deals public education a double blow. It not only strikes the *Pickering* balance against school principals and superintendents, but denies them qualified immunity as well. It ought not be necessary to catalog the harms done to public education by the majority's one-two punch, except that the majority disavows that its decision will do any such harm. *See ante* at 26-27. In fact, stripping Martin of qualified immunity for his decision to reassign a pair of squabbling administrators begins by harming our circuit's superintendents, whose reasonable personnel decisions will now increasingly be the subject of federal lawsuits. But it ends by harming our circuit's children and teachers, who depend on strong administrators for collegial and orderly schools that produce lessons rather than lawsuits.

As I have explained, I believe that this case involves little more than a poisonous personality conflict. The majority believes something else. According to the majority, this case is not about Love-Lane's inability to get along with others; it is instead about Love-Lane's outspoken opposition to a disciplinary program that had been approved by Lewisville's parents, teachers, and administration. *See ante* at 12. If we take the majority on its own terms, we ought indeed to be troubled. There is no question that Love-Lane had the opportunity to voice her objections, which simply did not persuade others at Lewisville. And there is no question that Love-Lane could have made

valuable contributions to life and disciplinary practice at Lewisville in any number of constructive ways. But communities like Lewisville should be able to implement their disciplinary decisions, without the unremitting opposition of the very administrators charged with carrying out those decisions. Instead, localities will now find their efforts at disciplinary improvement the subject of litigation.

As any school teacher knows, this is regrettable. Keeping order in our nation's schools is among our most pressing educational concerns. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) ("Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems."); *People v. Pruitt*, 662 N.E.2d 540, 545 (Ill. App. Ct. 1996) ("We long for the time when children did not have to pass through metal detectors on their way to class, when hall monitors were other children, not armed guards, when students dressed for school without worrying about gang colors."). Sadly, almost half of America's teachers report that they spend more time trying to keep order in their classrooms than actually teaching students. *See* Jean Johnson & Ann Duffett, Public Agenda, *Where We Are Now: 12 Things You Need to Know About Public Opinion and Public Schools* 16 (2003).

Of course, a breakdown in order and discipline leaves teachers unable to educate and students unable to learn. *See, e.g.*, *T.L.O.*, 469 U.S. at 350 (Powell, J., concurring) ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students."). And yet the consequences stretch far beyond missed opportunities for learning, because the more severe a school's disciplinary problems are, the more likely it is that the school's students will be victims of violent or even extremely violent encounters. *See* Amanda K. Miller & Kathryn Chandler, U.S. Department of Education, *Violence in U.S. Public Schools: 2000 School Survey on Crime and Safety* 20 (2003). It is not difficult to understand, then, why an overwhelming number of Americans believe that the lack of student discipline is a serious problem in their local schools. *See* Johnson & Duffett, *Where We Are Now* at 26.

The majority is unwilling to trust the efforts of public school systems to bring about disciplinary improvement. It places its bet not on

the ability of communities to devise their own solutions to disciplinary problems, but on litigation that serves to undercut those very same solutions. The majority's unwillingness to allow communities to recognize problems and address them through the medium of democracy does serious harm to public education. It siphons off educational efforts into depositions and scarce educational dollars into attorneys' fees. It places accountability in the courts rather than in school boards and the administrators answerable to them. "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992). To be sure, democratic processes are robust and sometimes produce decisions that do not please everyone. Yet to displace democracy too readily with judicial supervision is to discourage joint and voluntary efforts at improvement and ultimately to miss out on the more generous possibilities of America.

The majority disclaims the novelty of its approach, as if its opinion were nothing more than a routine application of *Pickering* and its progeny. *See ante* at 33, 27. With all respect, this is simply not the case. We have never accorded so little deference to the views of public school administrators or such short shrift to well-established principles of qualified immunity. Under the majority's regime, courts, not schools themselves, will have the final word on questions of school discipline. And with lawsuits waiting in the wings, principals and superintendents will be reluctant to do their part in resolving disciplinary problems or in reconstituting dysfunctional administrative teams.

But nowhere will the effects of this litigation be felt more severely than on the ability of educators to set expectations for their students. Only by establishing such expectations can schools bring out the best in children and give them every chance at success. But setting expectations requires order in public school systems and strong working relationships between public school officials. It requires that school authorities be able to set reasonable goals for their local administrators, who in turn set standards for the students they are charged with educating. In short, expectations for an orderly environment go hand-in-hand with expectations for a creative and productive learning experience. To have litigation at every turn is the surest way to undercut

the standards that challenge students and the expectations that form the essence of education itself.

## V.

In the final analysis, even if we disagree with Martin's personnel actions, his educational philosophy, his view of school discipline, or his feelings about the need for cooperative relations at the head of a school within his district, that is a far cry from saying that he violated clearly established federal law. In holding that he did, my fine colleagues have made a serious mistake.

Martin, like most teachers, principals, and superintendents, presumably entered the public school system to educate children, not to engage in the debilitating litigation that this lawsuit has come to represent. If decisions like Martin's are going to sow the seeds of federal actions, school administrators will either be cowed into inaction or they will seek the greener pastures of private schools, where education, not litigation, remains the top priority. I am well aware that many children "do[ ] not have the option of going to a private school or somewhere else," *ante* at 27, but the teachers and principals who educate them do — and the majority is chasing them from public schools.

That is a shame, because public education represents something quite special in this country — the opportunity for Americans of all races and ethnicities and backgrounds to prepare together for the challenges and responsibilities of citizenship. Public school systems deserve the best this nation has to offer. But the best educators have other opportunities, both within education and without, and the inability to pursue learning without lawsuits is driving them away from where America needs them most. To eviscerate the doctrine of qualified immunity, as the majority has done here, is to subject public schools uniquely to the omnipresent spectre of litigation, to the detriment of the children and communities they were intended to serve. I commend and would affirm the judgment of the district court.